IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DALE WIEGERT,

                Plaintiff,

v.                                                OPINION and ORDER

ADAMS COUNTY, BRENT R. YORK,               24-cv-163-jdp
and JIM BIALECKI,

                Defendants.

---

This case arises out of a notice that plaintiff Dale Wiegert received, prohibiting him from coming onto any property owned by Adams County, including the courthouse and the office where Wiegert received veteran services. If Wiegert needed county services, he would have to communicate through email unless he had an emergency. Defendant Brent R. York was the sheriff for Adams County; defendant Jim Bialecki was the acting county manager. Both were involved in approving and issuing the notice. Wiegert contends that defendants issued the notice because he was complaining about veteran services staff, thus violating the First Amendment, and he seeks damages under 42 U.S.C. § 1983.

Defendants move for summary judgment on multiple grounds, but the court need only consider one of them, which is that Wiegert has not adduced evidence from which a reasonable jury could find that either defendant issued the notice because Wiegert complained about county staff. Rather, the undisputed facts show that defendants issued the notice because a county employee complained to them that Wiegert was engaging in aggressive conduct that made the employee feel unsafe.

Wiegert disputes the employee's account of their interactions, and he denies that he acted aggressively. In fact, Wiegert alleges that the employee admitted to refusing services

because of Wiegert's grievances. But that dispute is immaterial because Wiegert did not sue the county employee, and defendants did not witness the interaction; they relied on the employee's account. The details of what the employee told defendants are hazy, but it is undisputed that the employee's complaint was about Wiegert's "behavior and demeanor," not his grievances or the content of his speech. Wiegert points to no reason why defendants should have disbelieved the employee. Without evidence of retaliatory intent, Wiegert's claims against the individual defendants fail. And his claim against Adams County rests on his claims against the individuals, so that claim necessarily fails as well. The court will grant summary judgment to all defendants.

This is not to say that the notice was a good idea or that defendants exercised good judgment. Defendants can be criticized for failing to investigate the employee's allegations: neither defendant asked Wiegert for his side of the story or otherwise gave him an opportunity to be heard before issuing the notice. And the notice appears to be an exaggerated response to the employee's allegations: defendants do not explain why the notice barred Wiegert from all county property when only one employee in one office complained about him. Defendants do not even identify what legal authority they had to issue the notice.

But Weigert does not contend that these problems with the notice are relevant to his claim. Wiegert is not asserting a claim for negligence or a violation of the Due Process Clause, he does not contend that he has a constitutional right to come onto county property, and he does not contend that issuing trespass notices exceeds defendants' authority. Rather, Wiegert's sole claim is that defendants issued the notice "in retaliation for Wiegert's having lodged his grievances against Adams county employees and agents." Dkt. 1, ¶ 501. Wiegert does not have evidence to support that claim, so the court must grant defendants' summary judgment motion.

2

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

As a veteran, Wiegert receives benefits through the Veterans Administration (VA). In 2019, the VA denied payment for emergency medical services that Wiegert received while on vacation. Wiegert contacted the County Veterans Service Office in Adams County for assistance. Richard Schlichtmann, a veterans service officer, contacted the VA on Wiegert's behalf, but Schlichtmann's efforts were not successful in persuading the VA to approve payment.

In February 2021, Wiegert prepared a "30-plus page appeal" and he sent it to Schlichtmann, who agreed to review it and recommend changes. Schlichtmann was on lunch break when Wiegert came into the office to discuss the appeal later in February, so Wiegert spoke to Scott Lowrey, another service officer.

According to Wiegert, Lowrey told him that Mindy Dale, the county's corporate counsel, concluded that the office could no longer provide any assistance to Wiegert, and Wiegert would have to hire his own lawyer for the appeal.[1] Wiegert asked Lowrey why his appeal had been shared with Dale, and Lowrey said that Schlichtmann had sent the appeal documents to "the court annex and that it had then been sent to multiple people within the

---

[1] This is inconsistent with Schlichtmann's declaration, which states that Wiegert had prepared his appeal documents as if *Schlichtmann* were submitting the appeal on Wiegert's behalf, and staff told Wiegert that they could *assist* him, but they could not sign the appeal or file it on Wiegert's behalf. Dkt. 16, ¶ 13. But this fact is not material to the summary judgment motion, and defendants do not dispute Wiegert's version in his proposed findings of fact, Dkt. 30, ¶ 21, so the court will accept Wiegert's version as undisputed.

3

County Annex and outside of the court annex and to" Dale. Dkt. 25, ¶ 23.[2] Wiegert accused office staff of violating the law by sharing his appeal materials without his consent. Neither side takes a position in their briefs on whether anything the employees did violated the law.

Schlichtmann says that Wiegert was "yelling" at Lowrey when he returned from break, and Wiegert "appeared angry and agitated." Dkt. 16, ¶ 12. Wiegert says that both he and Lowrey "were speaking forcefully but neither of us were yelling." Dkt. 25, ¶ 25. Wiegert does not explain what he means by "speaking forcefully." Lowrey did not submit a declaration, and he was not deposed.

Wiegert and Schlichtmann provide opposing accounts of their interaction, but they agree on some points. Wiegert repeated his accusation to Schlichtmann that sharing his appeal documents violated the law, and he told Schlichtmann that he would be filing a grievance against him. Schlichtmann agreed to call Dale and placed her on speaker phone so Wiegert could speak with her. Wiegert again said that it was a violation of the law to share his appeal documents and that he would be filing a complaint. At some point, Schlichtmann told Wiegert to shut up. Ultimately, Schlichtmann asked Wiegert to leave.

According to Schlichtmann, Wiegert was "screaming" at Schlichtmann during their interaction; Wiegert "demanded" to speak with Dale and then yelled at her too; at one point, it "appeared" that Wiegert "was trying to come into" Schlichtmann's locked office; and Wiegert "became increasingly angry, aggressive, and threatening to the point that Mr. Schlichtmann feared for his life and the safety of the people in the vicinity." Dkt. 29, ¶¶ 18–19, 25, 27, 29.

---

[2] Schlichtmann says that he shared the documents with corporate counsel because Wiegert had filled out the appeal documents in Schlichtmann's name, and Schlichtmann did not know how to proceed. Dkt. 29, ¶¶ 12–13.

Schlichtmann says that he even directed Lowrey to call 911, but the parties do not say whether the call was made or whether first responders came to the scene. Wiegert denies that he yelled or acted aggressively, and he says that he left the office without incident. Dkt. 25, ¶ 32.

Later in February 2021, Wiegert filed a complaint against Dale with the Office of Lawyer Regulation. (Wiegert later put this complaint "on hold," Dkt. 30, ¶ 19, but he does not say why, and he does not say whether he ever pursued it.) In March 2021, Wiegert called the Adams County court annex to determine how to file grievances against Schlichtmann, Lowrey, and Dale. Wiegert left a message for defendant James Bialecki, the interim county manager, but Wiegert did not say in his message what the call was about. Bialecki did not return the call.

On March 8, Wiegert emailed Schlichtmann and left a message for him, repeating his allegation that Schlichtmann had violated the law by sharing his appeal documents, and he directed Schlichtmann to have his documents ready for pick up. Schlichtmann did not respond. On March 15, Wiegert sent another email that he needed his records for his appeal, so he would come to the office on March 16 to pick them up. Again, Schlichtmann did not respond.

When Wiegert arrived at the veterans office on March 16, the door was locked, and a sign on the door read "By appointment only." No one responded when Wiegert "loudly knocked" on the door or window. Dkt. 29, ¶ 34. He returned to the office several times that day and each time loudly knocked on the door or window. Schlichtmann says he did not answer the door because Wiegert's "demeanor and behavior" made Schlichtmann "feel threatened." Dkt. 29, ¶ 36. Schlichtmann also says it was common for Wiegert to come to the office without an appointment and to repeatedly knock and yell through the glass if staff did not promptly answer the door, even if it was clear that staff were already assisting other clients. *Id.* ¶ 32–33.

5

The same day, Wiegert received a call from Michelle Waltermath, the Adams County human resources manager, returning the call that Wiegert made to the court annex earlier that month. Wiegert complained about multiple issues to Waltermath, including that Schlichtmann, Lowrey, and Dale had violated his rights, and no one was answering the door at the veterans office. He also complained that veterans office staff were slow to respond to requests for assistance. He asked for a meeting with Waltermath and Bialecki. Waltermath agreed to arrange a meeting with Bialecki and the county board. That meeting did not happen.

On March 17, Wiegert returned to the veterans office and again "loudly knocked" on the door or window. *Id.* ¶ 37. The parties agree that Schlichtmann told Wiegert through the door that he was not going to help Wiegert anymore. But the parties dispute why. According to Schlichtmann, he told Wiegert it was "because of his behavior towards [Schlichtmann] and others." Dkt. 16, ¶ 18. According to Wiegert, Schlichtmann told him it was because Wiegert "tried to file complaints" against Schlichtmann. Dkt. 25, ¶ 61.

Wiegert went to the court annex to make another complaint against Schlichtmann. When he arrived, Wiegert saw defendant Brent York, the sheriff, at the door. Wiegert asked York to be a witness for him as he made his complaint, and York agreed. Wiegert asked a county clerk to contact Waltermath so that he could make another complaint. Once on the phone with Waltermath, Wiegert said that he was "filing a First Amendment grievance against Defendant Schlichtmann for his retaliatory acts and what had just taken place at the CVSO office." *Id.* ¶ 67. Wiegert does not say whether he described the alleged "retaliatory acts" to Waltermath or whether York heard his complaint.[3]

---

[3] In his declaration, York says that Wiegert left the building after the county clerk told him that Waltermath was not available on a speaker phone. Dkt. 14, ¶ 10. But defendants do not

On March 17 or 18, Schlichtmann contacted York about Wiegert. Schlichtmann says that he "expressed [his] concerns about Mr. Wiegert's aggressive and threatening behavior and demeanor at the [veterans office]. [Schlichtmann] told Sheriff York what had transpired in February and March and that [Schlichtmann] feared for [his] safety due to Mr. Wiegert's continuing conduct." Dkt. 16, ¶ 19. Schlichtmann provides no other details about what he told York about Wiegert. York says only that he "learned that Mr. Schlichtmann had voiced concerns about Mr. Wiegert's behavior and demeanor while interacting with staff at the County Veterans Service Office that made him and others feel threatened." Dkt. 14, ¶ 11. Bialecki's declaration includes a nearly identical statement. Dkt. 15, ¶ 4.

On March 18, there was a meeting between York, Bialecki, Dale, Waltermath, and Schlichtmann to discuss "Wiegert's behavior." Dkt. 29, ¶ 62. Schlichtman did not mention Wiegert's complaints at any point during the meeting. Schlichtmann said he wanted to get a restraining order against Wiegert "because [Schlichtmann] feared for his safety due to Mr. Wiegert's behavior and demeanor." *Id.* ¶ 63. The suggestion of a restraining order was rejected because it would require a court proceeding and might not protect other veterans office staff. Dale asked how "concerns about Mr. Wiegert's behavior" would be handled at a private office. York stated that a harassing or threatening individual could be "trespassed" by law enforcement, meaning that the sheriff's office would issue an order prohibiting the individual from coming to the place of business. The group agreed to the issuance of a trespass notice and also to provide an email address that Wiegert could use to contact county offices and obtain services.

---

dispute Wiegert's proposed finding of facts that he made a verbal complaint to Waltermath over the phone. Dkt. 30, ¶¶ 46–52.

7

York drafted the trespass notice. It prohibits Wiegert from "entering in or upon . . . [a]ny property owned by Adams County," including the courthouse and the veterans office. Dkt. 17-2. It also warns Wiegert that a violation of the notice "may result in your immediate arrest and or issuance of a citation." *Id.* An email address is provided "[i]f [Wiegert] need[s] assistance from any Adams County office or department." *Id.* The notice directs Wiegert to call 911 for an emergency.

On March 19, York called Wiegert to come to the sheriff's department so that York could give him the trespass notice. Wiegert refused to come, so York said he would mail the notice. Wiegert later received the notice by email.

Also on March 19, Bialecki approved a written notice to Adams County employees that Wiegert "is not to come onto Adams County property." Dkt. 17-3 The notice directs employees to "follow the attached request for deputy guidelines." *Id.* The parties did not provide those guidelines to the court or explain what the guidelines are.

In May 2021, Wiegert moved "down south." Dkt. 30, ¶ 90. The parties do not say whether Wiegert moved out of Adams County or whether he ever attempted to go on Adams County property after the notice went into effect.

ANALYSIS

Wiegert contends that defendants issued the trespass notice to retaliate against him for complaining about county staff, in violation of his First Amendment rights to free speech and to petition the government for redress of grievances.[4] A retaliation claim under the First

---

[4] Wiegert includes one sentence in his complaint alleging that "part of the motivation [for issuing the trespass notice] was to retaliate against Mr. Wiegert for audio recording some of

8

Amendment has three elements: (1) the plaintiff engaged in protected activity; (2) the defendant took action that would dissuade the average person from exercising his First Amendment rights; and (3) the defendant took the adverse action because of the plaintiff's protected speech. *See 145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 766 (7th Cir. 2021) (Petition Clause); *Harnishfeger v. United States,* 943 F.3d 1105, 1112–13 (7th Cir. 2019) (Fre Speech Clause). Wiegert also contends that Adams County may be held liable because the individual defendants are "final policymakers," so their conduct may be imputed to the county. *See Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780–81 (7th Cir. 2011).

For the purpose of their motion for summary judgment, defendants do not dispute that Wiegert's complaints about county employees are protected under the First Amendment. But defendants contend that Wiegert cannot prove either that they issued the notice because of his complaints or that the notice would deter the average person from exercising his First Amendments. Wiegert's claim against the county rests on proving a violation against the individual defendants, so defendants say that the claim against the county fails for the same reasons as the claims against the individual defendants. In the alternative, the individual defendants contend that they are entitled to qualified immunity, and the county contends that the individual defendants are not final policymakers, so there is no basis for municipal liability.

The issue of causation is dispositive, so it is not necessary to consider the other issues. The question is whether there are any genuine factual disputes that could make a difference on

---

his interactions with county officials." Dkt. 1, ¶ 478. Neither side discusses this theory in their summary judgment briefs, so the court infers that Wiegert has abandoned that theory. In any event, Wiegert has not adduced evidence to support the theory. Wiegert says in his declaration that York told him to turn over his audio recordings, Dkt. 25, ¶ 72, but it would not be reasonable to infer from that alone that York retaliated against Wiegert for making the recordings.

the causation element, or, stated another way, whether a reasonable jury could find for Wiegert, after drawing all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

Wiegert has adduced evidence that *Schlichtmann* attempted to retaliate against him for complaining. In fact, Wiegert alleges that Schlichtmann admitted that he was denying services to Wiegert because of the complaints that Wiegert made about county staff. Wiegert also denies that he yelled at any county staff or otherwise acted aggressively. Accepting Wiegert's version as true, as the court must on a motion for summary judgment, it would be reasonable to infer that Schlichtmann went to York and asked for a restraining order, not because of any aggressive behavior by Wiegert, but because Schlichtmann was annoyed by Wiegert's complaints.

But Wiegert did not sue Schlichtmann, and liability for constitutional claims is personal. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).[5] In other words, Wiegert must show that each defendant took an adverse action against Wiegert because of the protected conduct; it is not enough to show that defendants relied in good faith on a third party who had a retaliatory motive. *See id.* For example, in *Wilson v. Greetan*, this court held that a hearing officer could not be held liable for retaliation under the First Amendment simply because he found the plaintiff guilty of a conduct report that was issued by a third party who may have had a retaliatory motive. 571 F. Supp. 2d 948, 955 (W.D. Wis. 2007). The plaintiff had to prove

---

[5] The law did not prohibit Wiegert from suing Schlichtmann. A non-decisionmaker with a retaliatory motive may be held liable for a constitutional violation if he caused the decisionmaker to take an adverse action against the plaintiff. *See Taylor v. Ways*, 999 F.3d 478, 488–89 (7th Cir. 2021).

that the hearing officer shared the retaliatory motive of the officer who issued the conduct report. *Id.*

In this case, Wiegert has not adduced evidence that defendants shared any retaliatory motive that Schlichtmann held. Wiegert's complaints were not against either defendant, and Wiegert offers no theory for why defendants would want to retaliate against Wiegert for making complaints about employees at the veterans office. It is undisputed that Schlichtmann said nothing to either York or Bialecki about Wiegert's complaints, and defendants did not discuss Wiegert's complaints before issuing the notice. Wiegert points to no admissible evidence that Bialecki was even aware of those complaints. He states in his declaration that Waltermath told Bialecki about the complaints, Dkt. 25, ¶ 55, but he provides no foundation for that assertion, so the court may not consider it. *See Ani Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 55 (7th Cir. 2015). York may have overheard Wiegert tell Waltermath that Schlichtmann had committed "retaliatory acts" against Wiegert, but there is no evidence that York knew any of the details of that allegation, or, more important, that York was bothered by Wiegert's complaints.

In his declaration, Wiegert states that York told him that "he was to provide [Wiegert] a trespass notice for the grievances [he] had made against county employees." Dkt. 25, ¶ 79. But that statement is contradicted by an audio recording that Wiegert himself made of the conversation between Wiegert and York. Dkt. 31-1. York did not refer to Wiegert's grievances during that conversation. Wiegert did allege retaliation during the conversation, but York denied this and said that Wiegert's "actions and behaviors are concerning" to county staff. *Id.* York remained calm and spoke softly throughout the conversation despite Wiegert's loud voice,

angry tone, disrespectful language, and repeated accusations. Nothing in the conversation supports an inference that York issued the trespass notice because of Wiegert's complaints.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). In this case, it is clear from context that the recorded conversation is the one that Wiegert is referring to in his declaration, the recording includes the entire conversation, and the speech of both Wiegert and York is clear throughout the conversation. So Wiegert's account is blatantly contradicted by the audio recording, and no reasonable jury could believe Wiegert's testimony. The court will not consider the testimony.

Wiegert also says that retaliatory intent can be inferred because nothing Schlichtmann told York suggested that Wiegert had made a "true threat" against Schlichtman, and anything other than a true threat would be protected speech. Dkt. 22, at 5–6. But this is conflating elements of Wiegert's claim. As already noted, defendants concede for the purpose of summary judgment that Wiegert's *speech* was protected. But Schlichtmann was not complaining about Wiegert's speech, he was complaining about Wiegert's "behavior and demeanor." Again, it is undisputed that Schlichtmann said nothing to defendants about Wiegert's speech. Perhaps Schlichtmann's response to Wiegert's behavior was unreasonable, and perhaps defendants should not have taken Schlichtmann's word for it that Wiegert was acting aggressively. But Wiegert cites no authority for the view that defendants were required under the First Amendment to conduct an investigation into Schlichtmann's allegations or that the First Amendment protected the conduct that Schlichtmann was complaining about. *See Milestone*, 665 F.3d at 784–85 (upholding ban on visiting community center because plaintiff violated

rules that "patrons treat everyone with respect and courtesy," refrain from "abusive, vulgar, or demeaning language," and "treat Center personnel with respect"). So York and Bialecki are entitled to summary judgment. Wiegert's theory of municipal liability rests on a finding that York or Bialecki violated the First Amendment, so the county is entitled to summary judgment too.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Adams County, Brent R. York, and Jim Bialecki, Dkt. 11, is GRANTED. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered July 21, 2025.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge